ROBERTSON AND BROWN *against* THE UNITED INSURANCE COMPANY.

An insurance on the vessel will not cover a *bottomry* interest, unless it is expressly mentioned in the policy.

Where a bottomry bond executed by the master, after the usual recital and clause hypothecating the vessel for the payment of the money advanced, contained the following clause : " And for the better performance of all the covenants and agreements herein contained, I, the said N. B." (the obligor) " for the consideration aforesaid do *grant, bargain and sell* the said ship, John, and premises to the said G. R." (the obligee) " his executors," &c. with the usual proviso, that on payment, &c., the whole was to be void : it was held, that these words did not destroy the character or operation of the bond.

THIS was an action on a policy of insurance, on the British ship John, from New York to Martinique.

The ship was owned by a British subject residing at Mar-

(*a*) See 1 Phillips on Insurance, ed. 1840, vol. 1, 697, 698, 731, 732 ; vol. 2, p. 387.

Robertson and Brown v. United Insurance Company.

tinique, and being in New York, and bound to Mar-
tinique, *the plaintiffs furnished to the master 10,549    [*251]
dollars, for repairs, &c. and took a bottomry bond
for the amount.    The plaintiffs effected the policy for 10,000
dollars, with a view to secure that sum, as part of their ad-
vances for the vessel.    The sum was not specified in the po-
licy, as on bottomry.    During the voyage the vessel was
captured by the French, and the plaintiffs abandoned to the
defendants.

The bottomry bond, after the usual recital and clause
hypothecating the vessel for the payment of the money, con-
tained the following clause : "And for the better perform-
ance of all the covenants and agreements herein contained,
I, the said Niel Brown, for the consideration aforesaid, do
grant, bargain, and sell the said ship John and premises to
the said G. R. his executors, administrators and assigns;"
with the usual proviso, that on payment of the money, inter-
est, &c. the whole was to be void.

A verdict was taken for the plaintiff, as for a total loss,
subject to the opinion of the court, upon a case containing
the above facts, with liberty to either party to turn it into a
special verdict.

It was agreed, that if the court should be of opinion that
the plaintiffs were entitled to recover for a total loss, judg-
ment was to be entered on the verdict ; or if entitled to a re-
turn of premium only, then judgment was to be entered for
the plaintiff for 1000 dollars; otherwise, a judgment was to
be entered for the defendants.

*B. Livingston*, for the plaintiff.

*Troup* and *Harison*, contra.

RADCLIFF, J.    The bill of bottomry in this instance is not
wholly in the usual form.    It not only pledges the ship, but,
in terms, " grants, bargains and sells" her to the plaintiffs.
This additional clause does not, however, appear to
me essentially to vary its character or *operation.    [*252]
It must still be considered as a contract of bottomry.
It was made by the captain in his capacity of master, and as
such, he could not sell the ship, nor do more than pledge

her, for the eventual payment of the money. The circumstance, that interest was reserved at seven per cent. only, cannot alter the case. That was a matter of agreement between the parties, and might have been increased or diminished at their pleasure.

Considering the contract as a bottomry only, it created a special interest, which, when insured, must be particularly expressed in the policy. (*Glover* v. *Black*, 3 Burr. 1394. S. C. 1 Black. Rep. 405.) This has long been determined to be the law and practice of merchants, and no usage appears to counteract it. The instances which have been mentioned, and which accompany this case, are too loose and uncertain to establish a different rule, and ought never to be admitted to overturn a principle so fully and clearly settled.

The plaintiffs, therefore, cannot recover on the policy, but are entitled to a return of the premium, for which no risk has been run by the defendants.

KENT, J. The question is, whether the bottomry interest was covered by the policy, as the bottomry was not specified.

The case of *Glover* v. *Black*, (3 Burr. 1394,) is decisive upon this point. It was there held that *respondentia* and *bottomry* must be mentioned in the policy, and that this was the law and practice of nations. The risk on a bottomry policy is peculiar. There is neither average nor salvage ;(*a*) and capture does not mean a temporary taking merely, but one that occasions a total loss. If the nature of the interest was not disclosed, the insurer might pay for a total loss on an immediate capture, without being apprised of his rights.

There cannot be any doubt, as to the contract in question being a true bottomry contract. It is agreeable to
[*253]   *the usual form, (1 Beawes, 139,) except as to the additional clause of the sale ; and taking contract together, and considering that it was made by the master, it is evident that the sale was only an hypothecation, or mort-

(*a*) See *infra*, 253, note (*b*.)

gage of the ship, which is the just definition of a bottomry contract.

, LANSING, Ch. J. was of the same opinion.

LEWIS, J. not having heard the argument, gave no opinion.

Judgment for the plaintiff, for a return of premium.(*a*)(*b*)

(*a*) As to return of premium, see *supra*, vol. i. p. 313, n. (*a*) to *Delavigne* v. *United Ins. Co.*

(*b*) 1. *Definition and nature of the Contract of Bottomry.*] The following definition is given by Mr. Smith, (in his Mercantile Law, Am. ed. 1847, p. 421.) " Bottomry is an agreement entered into by the owner of a ship, or his agent, whereby, in consideration of a sum of money advanced for the use of the ship, the borrower undertakes to repay the same with interest, if the ship terminate her voyage successfully, and binds or hypothecates the ship for the performance of his contract. The instrument by which this is effected is sometimes in the shape of a deed poll, and is then called a bottomry bill ; sometimes in that of a bond." (See the forms of both, Appendix to Abbott on Shipping.)

This contract, in many respects, agrees with that of marine insurance. In the one the lender bears the risk, in the other the assurer. In the one the profit, and in the other the premium is the price of the maritime risks, which are supported upon the same principles, and may be made subject to the same modifications. The rate of profit or of premium is greater or less, according to the duration and nature of the risks in the agreement ; the property which is the subject of the loan or assurance, is equally exposed to maritime risks, and each contract begins and ends under the same circumstances. In other respects, however, there is a marked difference. In bottomry the lender advances a certain sum—in insurance the assurer advances nothing ; on the contrary, he receives a premium. In bottomry things are necessary which may be the subject of a mortgage or pledge ; in insurance possible losses are sufficient. The lender upon bottomry contracts no obligation towards the borrower ; the assurer binds himself to indemnify the assured against the losses he assumes to the extent of the sum insured. (See 3 Pardessus, ed. 1841, §§ 887—889. See also Alauzet Traité Général des Assurances, ed. 1843, vol. 1, p. 490, 494. Also 3 Kent. Comm. 357. *The Draco,* 2 Sumner, 157.) A similar contract was known to the civil laws, *contractus nauticus seu trajectitiæ pecuniæ,* (Dig. lib. 22, Code 4, 33,) which existed where a sum was loaned upon condition, that a loss, during the voyage, either of the money or of the goods bought with it, should be borne by the lender. Contractus nauticus, seu trajectitiæ pecuniæ, ille est, quo pecunia alicui creditur, hac lege ut, si aut ipsa pecunia, aut merces ex ea comparatæ navigatione perierint, periculum sit creditoris, qui nihil hoc casu recepturus erit. (Pothier Pand. vol. 8, ed. 1821, p. 254.) Modestinus observes upon this contract—" *Trajectitia* (ea) pecunia est, quæ trans mare vehitur : cæterum, si eodem loci consumatur, non erit trajectitia. Sed videndum an merces ex ea pecunia comparatæ in ea causa habeantur ? (Id est, an contractus pecuniæ trajectitiæ sit, non solum

quum pecunia creditur, ut ipsa trans mare vehatur ; sed et quum pecunia cre-
ditur, ut merces ex illa comparandæ trans mare vehantur.)    Et interest utrum
etiam ipsæ periculo creditoris navigent ; (nimirum eo casu quo is qui ad eas
comparandas pecuniam accepit pactus est ut pecuniam non redderet, si mer-
ces navigatione perirent ;)  tunc enim trajectitia pecunia fit." (L. 1, Modest.
lib. 10, Pandect. et not. Poth.)

This is to be understood (says Pothier, *ut sup.*) that the contract is a mari-
time loan (*pecuniæ trajectitiæ*) not only when the money is lent which is to
be transported beyond sea, but also when it is to purchase merchandizes
which is to be exported.

And also that where he, who has borrowed money to buy merchandize,
has agreed that he shall not be bound to return it if the goods perish on the
voyage.  The loan upon bottomry, as by the common law, must appear
to have been made by express contract to that effect ; for otherwise, the infer-
ence was that the borrower intended to suffer the loss.   This is stated by Dio-
cletian and Maximian :  " Trajectitiæ quidem pecuniæ, quæ periculo credi-
toris mutuo datur, casus, antequam ad destinatum locum navis perveniat, ad
debitorem non pertinet.   Sine hujusmodi vero conventione, infortunio naufra-
gii debitor non liberabitur."  (L. 4, cod. h. t. 4, 33.)   If, however, such a con-
tract existed, then the risk of the lender attached from the time that it was
resolved to sail.   Quum autem hujusmodi conventio intervenit :  " In nautica
pecunia, ex ea die periculum spectat creditorem, ex quo navem navigare con-
veniat."  (L. 3, Modest. lib. 4, regul.)

The lender was only responsible for the perils of navigation and the acci-
dents of the sea.   Hence Diocletian and Maximian say :  " Quum proponas
te nauticum fœnus ea conditione dedisse, ut post navigium quod in Africam
dirigi debitor asseverabat, in Salonitanorum portum nave delata, fœnebris pe-
cunia tibi redderetur ; ita ut navigii duntaxat, quod in Africam destinabatur,
periculum susceperis :  perque vitium debitoris, nec loco quidem navigii serva-
to, illicitis comparatis mercibus, ea quæ navis continebat, fiscum occupasse ;
amissarum mercium detrimentum, quod non ex marinæ tempestatis discrimine,
sed ex præcipiti avaritia et incivili debitoris audacia accidisse asseveratur,
ascribi tibi juris publici ratione non permittit."  (L. 3, cod. h. t. 4, 33.)

The object of the loan upon bottomry is thus stated by Chancellor Kent,
(3 Comm. 353.)   To procure the necessary supplies for ships which happen
to be in distress in foreign ports, where the master and owners are without
credit, and in cases in which, if assistance could not be procured by means of
such instruments, the vessels and their cargoes must be left to perish.   The
authority of the master to hypothecate the ship and freight, and even the
cargo, in a case of necessity, is indisputable.   The vital principle of a bot-
tomry bond is, that it be taken in a case of unprovided necessity, where the
owner has no resources or credit for obtaining necessary supplies.   (Vide
id. 171.)   The degree of necessity that will justify the master in taking up
money on bottomry for repairs, and that will justify the creditor in lending it,
is examined with great learning and judgment in the case of the ship Forti-
tude.   (C. C. U. S. Mass. August, 1838.   See the Law Reporter, vol. i. No. 5.
3 Sumner's R. 228.)   Loans upon bottomry made without fraud may as well

Robertson and Brown v. United Insurance Company.

be made at the port of destination as at any foreign port, (3 Kent. Comm. 361 ; 3 Johns. R. 352,) though not at the owner's place of residence while the means of communication with him are open ; for in such a case the reason of the loan fails. (Abbott, 123. Molloy, b. 2, ch. 11, § 11. *Lester* v. *Baxter*, 2 Str. 695. See the Rhadamanthe, 1 Dodson, 201. The Barbara, 4 Rob. 1. La Ysabel, 1 Dodson, 273.) The place where the money is loaned, however, does not seem to be material, except so far as it goes to show whether or not there was a necessity for the contract. Thus, in a case of necessity, the master of a ship may hypothecate her, as well at the port of destination as at any other foreign port. (*Reade* v. *Commercial Insurance Company*, 3 Johns. 352.) But he cannot do this in the port from which he first sails. (*Sloan* v. *Ship A. E. I.* Bee, 250. *Turnbull* v. *The Enterprize*, Bee, 345.) Nor in any case except one of great distress, and when he has no other means of relief. (*Tunno* v. *The Mary*, Bee, 120. *Patton* v. *The Randolph*, Gilpin, 457.) Nor does it seem to be material that the ship is at sea at the time of the loan. In *Conrad* v. *The Atlantic Insurance Company*, (1 Peters, 386,) the supreme court of the United States decided that it is not necessary that a *respondentia* loan should be made before the departure of the ship on the voyage ; nor that the money loaned, should be employed in the outfit of the vessel, or invested in the goods on which the risk is run. It matters not at what time the loan is made, nor upon what goods the risk is taken. If the risk of the voyage be substantially and really taken ; if the transaction be not a device to cover usury, gaming or fraud ; if the advance be in good faith, for a maritime premium ; it is no objection to it that it was made after the voyage was commenced, nor that the money was appropriated to purposes wholly unconnected with the voyage. (See also 4 Wash. C. C. 662. *United States* v. *Delaware Ins. Co.* id. 418. 2 Emerigon, 382, 385, 386, 401, 481. 1 Valin, 366. 2 Marsh, 747, *a.* 3 Kent. Comm. 361, 362. See also *The Draco*, 2 Sumn. 157.)

To make a bottomry bond a valid hypothecation of the ship, the *obligee must show* that the advances were necessary to effect the objects of the voyage, or the safety of the ship. (*Putnam* v. *The Polly*, Bee, 157. *The Golden Rose*, Bee, 131. *The Aurora*, 1 Wheat. 96. *Hurry* v. *The John & Alice*, 1 Wash. C. C. 293. *Walden* v. *Chamberlain*, 3 Wash. C. C. 290. *Crawford* v. *The William Penn*, 3 Wash. C. C. 484. *Rucher* v. *Conyngham*, 2 Pet. Adm. 295. *The Mary*, Paine, 671. *Patton* v. *The Randolph*, Gilpin, 457.) And the bond must be given in a place where the owner has no personal credit, nor any goods of his own, nor of the master. (*Forbes* v. *The Hannah*, Bee, 348. *Rucher* v. *Conyngham*, 2 Pet. Adm. 295. *Canizares* v. *Santissima Trinidad*, Bee, 353. *Turnbull* v. *The Enterprize*, Bee, 345.)

There is a distinction between the powers of the master and owner in the execution of a bottomry bond. Such an instrument, given by the owner to procure money to buy a cargo, (*The Mary*, Paine, 671,) or to the master to secure wages and advances, (*Miller* v. *The Rebecca*, Bee, 151.) has been adjudged valid. So if a consignee is directed, by the owner of ship and cargo, to apply the whole proceeds of the cargo to discharge engagements made on the owner's account, he is not bound to apply those proceeds to dis-

charge expenses of the ship, and may lend his own money to the owner on marine interest. (*The Lavinia* v. *Barclay*, 1 Wash. C. C. 49.) And in *The Draco*, (2 Sumner, 157,) it was said that where the bond is made by the owner, it is not necessary that the money should be applied to the necessities of the vessel, cargo or voyage. One part owner, however, cannot take from the master a bottomry bond to bind another owner's share for repairs. (*Patton* v. *The Randolph*, Gilpin, 457.) But the power of the master, is much more limited; his duty is to complete the purposes of the voyage with as little delay as possible, and to save and return the ship; and the power to execute a bottomry bond is only delegated to him for this purpose. He may, therefore, when a voyage is broken up by capture, hypothecate the vessel for money advanced to enable him to bring her home, (*Crawford* v. *The William Penn*, 3 Wash. C. C. 484,) or to repair and provision her, (*Murray* v. *Lazarus*, Paine, 572 ; *Ross* v. *The Active*, 2 Wash. C. C. 226 ; *The Packet*, 3 Mason, 255,) or to relieve her from actual arrest on account of debts which are a lien. (*The Aurora*, 1 Wheaton's R. 96.) But the master cannot hypothecate for the mere purpose of paying a pre-existing debt, (*Id.*; see also Bee, p. 339,) nor, *it is said*, if he have on board goods or money of his own. (*Cupesino* v. *Perez*, 2 Dallas, 195. See *The Packet*, cited above, where the principles applicable to this contract are fully considered.)

In *The Ship Virgin et al.* v. *Vyfhius*, and *Vyfhius* v. *The Ship Virgin et al.* (8 Peters, 538,) an objection was taken to the bond, that the supplies and advances might have been obtained on the personal credit of the owners of the ship without an hypothecation. But it was held, that the necessity of the supplies and advances being once made out, it is incumbent upon the owners, who assert that they could have been obtained upon their personal credit, to establish that fact by competent proofs, unless it is apparent from the circumstances of the case. It was also objected, that the supplies and repairs were, in the first instance, made on the personal credit of the master of the ship, and therefore could not be afterwards made a lien on the ship; and held, that the lender on the bottomry bond might well trust the credit of the master as auxiliary to his security ; and the fact that the master ordered the supplies and repairs before the bottomry was given, can have no legal effect to defeat the security, if they were ordered by the master, upon the faith, and with the intention that a bottomry bond should be ultimately given to secure the payment of them. In cases of this sort, the bottomry bond is in practice ordinarily given after the whole supplies and repairs have been furnished ; for the plain reason that the advances required can rarely be ascertained with exactness until that period. It was also objected, that the advances were for a voyage not authorized by the owners ; that the original orders were for the master to get a freight for Baltimore or New York, and if he could not, then to proceed to New Orleans ; whereas the master broke up his voyage, and without any freight returned to Baltimore. But the court decided: It may be admitted, that if a bottomry lender, in fraud of the owners, and by connivance with the master for improper purposes, advances his money on a new voyage, not authorized by the instructions of the owner, his bottomry bond may be set aside as invalid. But there is no pre-

Robertson and Brown v. United Insurance Company.

tence to say, that if the master does deviate from his instructions, without any participation or co-operation or fraudulent intent of the bottomry lender, the latter is to lose his security for his advances, bona fide made for the relief of the ship's necessities. (See also *Canizares* v. *The Santissima Trinidad,* Bee, 361. *Wilmer* v. *The Smilax,* 2 Peters Adm. 300 n.)

It is no objection to a bottomry bond, that it was taken for a larger amount than that which could be properly the subject of such a loan; for a bottomry bond may be good in part and bad in part; and it will be upheld by courts of admiralty, as a lien to the extent to which it is valid; as such courts, in the exercise of their jurisdiction, are not governed by the strict rules of the common law, but act upon enlarged principles of equity. (*The Ship Virgin,* cited above. See also *The Packet,* 3 Mason, 255.) But where various demands are mixed up in such bond, part only of which will sustain a hypothecation, the obligee must exhibit them to the court in such manner, that they may be separately considered. (*The Aurora,* 1 Wheat. 107.)

A bottomry bond will be void if the vessel be lost through any of the perils assumed by the lender, even though the borrower afterwards obtain a compensation therefor. Thus where money was lent on a *bottomry* bond, conditioned that if the vessel should perform the voyage, the money should be paid in twenty days after her arrival; if she should be lost through perils of the seas, or by fire, or the enemies of the United States, the bond to be void. The vessel was captured by a British cruiser and condemned as lawful prize; upon the appeal, the condemnation was reversed, and full compensation received by the owner, for vessel, cargo, and freight, by virtue of an award of the commissioners under the treaty of November, 1794. It was held that the obligee could not recover in an action of debt brought on the bond. (*Appleton* v. *Crowninshield,* 3 Mass R. 443.) But in such a case it is said the lender can recover his money in an action for money had and received. (Parker, J. 3 Mass. R. 464; and see per Sewall, J p. 468:) " The compensation received by the borrower—the defendant—may comprise a salvage, for which he is accountable to the lender—the plaintiff; but a demand of that nature, if it is recoverable, must be maintained in another form of action." Sedgwick, J. thought the plaintiff might recover in another form of action. (P. 475.)

A valid bond will be upheld, if there be no laches on the part of the lender, even against a bona fide purchaser without notice. (*The Draco,* 2 Sumner, 157.) And where an owner mortgaged his ship, in November, but was permitted to remain in possession and act as absolute owner, and her papers and register were unaltered, and in July following, he gave a bottomry bond abroad, the lender's claim, he having no notice of the mortgage, was preferred to that of the mortgagee. (*The Mary,* Paine, 671.) But though the courts are desirous to protect the rights of the lender in good faith, and to uphold a contract, the effect of which is to promote commerce, yet they require that the lender should regard and enforce those rights in due season, and not sleep upon them; for *vigilantibus non dormentibus succurrant jura.* Thus if the obligee of a bottomry bond permit the ship to make several voyages without asserting his lien, and executions are levied on her, his lien is lost.

Robertson and Brown v. United Insurance Company.

(*Blaine* v. *The Charles Carter*, 4 Cranch, 328. See also, per Story, J. in *The Aurora*, 1 Wheaton, 104.)

Seamen have a lien prior to that of the holder of a bottomry bond, for their wages; but the owners are also personally liable for such wages; and if the bottomry holder is compelled to discharge that lien, he has a resulting right to compensation over, against the owners; in the same manner as he would have, if they had previously mortgaged the ship. (*The Ship Virgin*, 8 Peters, 538.)

We have seen what risks were assumed by the lender under the civil law, and the common law accords therewith. They are stated by Mr. Phillips, (Insurance, vol. 1, p. 734, ed. 1840,) to be "the perils of the seas, captures and all inevitable accidents." Cleirac defines them to be the same usually covered by a policy of insurance, and Valin, the perils of the seas, piracy and captures. (See 1 Phillips on Insurance, ed. 1840, p. 734. 3 Kent Comm. 355. Pothier Cont. a la grosse, aventure, n. 1. Emerigon Traité des Contrats, a la grosse, ch. 1, § 2.)

But it is not to be supposed that the lender takes the risk of the bad conduct of the borrower or his agents. (3 Kent Comm. 360. 1 Phill. on Ins. ed. 1840, p. 734. *Western* v. *Wildy*, Skinner, 152. Roccus de nav. n. 51. Code de Comm. art. 326. Ord. de la Mar. tit. Contrats a la grosse, art. 12. Emerigon, tit. 2, 509–512.) The perils of barratry, unseaworthiness, and deviation are not cast upon him by his contract. (3 Kent, 360. Condy's Marshall, 2, 753–758. Boulay Paty, t. 3, 158, *et seq.*; 171, *et seq.*; 192. Pardessus, ed. 1841, No. 894.) But if he sees fit to assume any of them in good faith, it is presumed that the maxim, *modus et conventio vincunt legem*, (Rep. 73,) would apply, (see 1 Phill. Ins. 734,) with the limitation, however, that he shall not charge himself with the faults of the borrower: *nulla pactione effici potest ut dolus præstetur.* (See judgment in *Cullen* v. *Butler*, 5 M. & S. 466.)

Upon this subject, Pardessus remarks, (vol. 3, ed. 1841, (p. 528,) "Cette responsabilité peut aussi, comme dans l'assurance, recevoir une extention conventionelle: ainsi, le prêteur peut se charger de la baraterie de patron; il peut prendre sur lui les risques particuliers attachés à certaines marchandises ou à certaines expéditions, les avaries provenant du vice propre de la chose, les dangers d'un commerce interlope. Dans toutes ces occurrences, la volonté des parties ne reçoit de limites que par les prohibitions de la loi."

Upon the construction of the contract of bottomry, the rule of the French law seems to be that in a doubtful case, the interpretation ought always to be made in favor of the borrower. Upon this question, Pardessus observes:— "Cette distinction, résultant de la différence entre le prêt à la grosse et l'assurance, repose sur ce que, dans le premier, l'emprunteur est le débiteur, et que, dans le doute, il faut prononcer en sa faveur; tandis que dans l'assurance, l'assuré est créancier de l'assureur, pour la réparation de toutes les pertes et domages qu'il pourra éprouver." (Droit Commercial, ed. 1841, No. 895.) The rule of the common law is, however, believed to depend upon different principles, and in this view it is somewhat important whether the contract of bottomry be executed by the borrower alone, or by both parties. In the for-

Robertson and Brown v. United Insurance Company.

mer case, I think the rule "*verba chartarum fortius accipiuntur contra pro-ferentem*," (Co. Litt. 36, *a,*) would be held to apply as in the case of a deed poll, and that the construction would consequently be in favor of the lender. No sufficient reason is perceived why the ordinary rules of construction should be laid aside in the solution of this contract.

2. *The Risk.*] The sum lent must be at the hazard of the lender during the voyage. Inasmuch as it is, in the language of the civil law, the *pretium periculi,* the danger must be incurred. (Per Lord Tenterden, Ch. J. in *Si-monds et al.* v. *Hodgson,* 3 Barn. & Ad. 50. *Jennings* v. *Insurance Compa-ny of Pennsylvania,* 4 Binney, 244. *The Mary,* Paine, 671. *Rucher* v. *Co-nyngham,* 2 Pet. Adm. 295. *Wilmer* v. *The Smilax,* id. note. *Thorndike* v. *Stone,* 11 Pick. 187.) In *Simonds et al.* v. *Hodgson,* (*ut sup.*) an instru-ment executed in a foreign port by the master of a ship, reciting, that his vessel bound to London, had received considerable damage, and that he had borrowed 1077*l.* to defray the expenses of repairing her, proceeded as fol-lows:—"I bind myself, my ship, her apparel, tackle, &c. as well as her freight and cargo, to pay the above sum with 12*l.* per cent. bottomry premi-um; and I further bind myself, said ship, her freight and cargo, to the pay-ment of that sum, with all charges thereon, in eight days after my arrival at the port of London; and I do hereby make liable the said vessel, her freight and cargo, whether she do or do not arrive at the port of London, in prefer-ence to all other debts or claims, declaring that this pledge or bottomry has now, and must have, preference to all other claims and charges until such principal sum, with 12*l.* per cent. bottomry premium, and all charges are duly paid." And it was held, upon error, that this was an instrument of bottomry, for an intention sufficiently appeared from the whole of it, that the lender should take upon himself the peril of the voyage; that the words *my arrival,* must be understood to mean *my ship's arrival,* and that the words, "I make liable the said vessel, her freight and cargo, whether she do or do not arrive at London;" were intended only to give the lenders a claim on the ship, in preference to other claims, in case of the ship's arrival at some other than the destined port, and not to provide for the event of the loss of the ship.

The same rule is stated in the civil law. Quum dicas te pecuniam ea lege dedisse, ut in sacra urbe tibi restitueretur, nec incertum periculum, quod ex navigatione magis metui solet, ad te pertinuisse profitearis; non est dubium, pecuniæ creditæ ultra licitum modum te usuras exigere non posse. (L. 2, cod. h. t. 4, 33.) And upon this principle Papinian said : "Nihil interest, trajec-titia pecunia sine periculo creditoris accepta sit, an post diem præstitutum et conditionem impletam periculum esse creditoris desierit. Utrobique igitur ma-jus legitima usura fœnus non debebitur. Sed in priore quidem specie, semper ; in altera vero, discusso periculo, nec pignora, vel hypothecæ, titulo magoris usuræ tenebuntur." (L. 4, Pap. lib. 3, resp.)

But when the principal sum has been put at hazard, even though the con-templated voyage never be performed, the lender is entitled to recover it, to-gether with the profit agreed to be paid. (3 Kent Comm. 357, 358. Boulay

Paty.  Cours de Droit Comm. t. 3, p. 174, *et seq.*; 167, *et seq.*  See Pardessus, ed. 1841, No. 894.)

3. *The interest.*]  The amount of interest upon this contract is only limited by the agreement of the parties.  (2 Blacks. Comm 457.  Smith's Mer. Law, 262.  3 Kent Comm. 355.)  And this was originally the rule of the civil law because of the risks to which the lender is subjected so long as the vessel is at sea.  Trajectitia pecunia propter periculum creditoris, quandiu navigat navis, infinitas usuras recipere potest.  (Paul. sent. lib. 2, tit. 14, § 3 )  But Justinian, by a constitution, limited the interest of this contract to 12 per cent. forbidding it entirely in others.  (L. 26, cod. 5, 32, *de usur.*)  When, however, the vessel arrives safely in port, no matter how much damaged, (for nothing but an utter annihilation of the subject hypothecated, will discharge the borrower on bottomry ;  *Thompson* v. *Royal Exchange Assurance Company,* 1 Maule & Selw. 30 ;  3 Kent Comm. 359 ;) the extraordinary interest ceases. (3 Kent. Comm. 362.)  This rule also existed in the civil law.  Trajectitiam pecuniam, quæ periculo creditoris datur, tandiu liberam esse ab observatione communium usurarum, quandiu navis ad portum appulerit, manifestum est. (L. 1, cod. h. t. 4, cap. 33.)

It has been made a question what interest is to be charged after the safe arrival of the ship.  Pothier and Pardessus, (Traité du Pret. a la grosse aventure, 51 ;  Cours de Droit Commer. 2–273,) are of opinion that no interest is chargeable on the profits of the loan after the cessation of the risk ; on the contrary, Emerigon, (t. 2, p. 414,) and Boulay Paty, (t. 3, 80–89,) think that legal interest begins upon the principal and profit as an absolute debt as soon as the rule ceases.  Chancellor Kent, (3 Commentaries, 362, n. b.) states the rule as laid down by Emerigon, and this is probably to be regarded as the rule in this country.  (*The Packet,* 3 Mason, 255.)

4. *As to the liability of the lender to average and salvage.*]  Lord Mansfield and Lord Kenyon denied it ;  (*Joyce* v. *Williamson* ;  *Walpole* v. *Ewer,* Park Ins. 6th ed. 563, 565 ; and see per Kent, J. in the principal case ;) but their position is contrary to the maritime law of France, and of other parts of Europe, and in Louisiana we have a decision against it.  (*Chandler* v. *Garnier,* 18 Martin, 599.)  The new French law, contrary to the ordinance of 1681, charges the lender with simple average, on partial losses, unless there be a positive stipulation to the contrary ; but such a stipulation, to exempt him from gross or general average, would be void, and contrary to natural equity. (Ord. de la Mar. h. t. art. 16.  Code, art. 330.  Emerigon, Traité des Contrats a la grosse, c. 7, sec. 1.)  The reasoning of Emerigon is conclusive in favor of the right of making the lender chargeable with his equitable proportion of an average contribution.  If he owes the preservation of his money lent, to the sacrifice made by others for the preservation of the ship and cargo, why should he not contribute towards a jettison, ransom, or composition, made for the common safety ?  If no such sacrifice had been made, he would have lost his entire loan, by the rapacity of pirates, or the violence of the storm.  (3 Kent Com. 359, 360.)  By the ordinance of Hamburg, he is not liable to con-

Robertson and Brown v. United Insurance Company.

tribute to general average. ('Tit. 9, a. 2 ; 2 Mag. 225, No. 931.)  In France the lender takes the risk of the general average losses, unless the parties expressly stipulate otherwise.  (Le Guidon, c. 19 a 5 ; Cod. de Com. l. 2, a 9, n. 141.)  And the law seems to be the same in Denmark. (*Walpole* v. *Ewer, Paik,* 629.  1 Ph. on Ins. 734, 735, *et seq.*  See also 3 Steph. N. P. 2203, and Pardessus, ed. 1841, vol. 3, No. 894.)  Mr. Phillips observes, (on Ins. 1840, p. 735,) " By saying there is no salvage in bottomry, Lord Mansfield may mean that the lender is not liable to contribute to the expense of saving the property in case of shipwreck, &c. or he more probably means that there is no constructive total loss ; for as to the part of the property saved, or the proceeds of it, there seems to be no doubt that it continues to be subject to the hypothecation, (1 Mag. 24, s. 24 ; *Appleton* v. *Crowningshield,* 3 Mass. Rep. 443 ; *Wilmer* v. *The Smilax,* Peter's Adm. Rep. 295, n.; 2 Val. 12, tit. des Cont. a Gorsse, a. 18 ; Cod. de Com. l. 2, *tit. 9,* n. 142.)

5. *Insurance of lenders' and borrowers' interest.*]  It is said that the lender upon bottomry may insure the interest which he has in the contract.  (1 Phillips on Insurance, 737.)  But in *Thompson* v. *Royal Exchange Insurance Company,* (1 M. & S. 30 ; 16 East, 214,) it was decided that an assured on bottomry cannot recover against the underwriter, unless there has been an actual total loss of the ship; for if the ship exist in specie, in the hands of the owners, though under circumstances that would entitle the assured on the ship to abandon, it will prevent its being an utter loss within the meaning of the bottomry bond.  Mr. Phillips, in commenting on this case, remarks: (vol. 1, ed. 1840, p. 738 :) " The doctrine here assumed, is, that as far as the borrower remains liable to pay the loan, the insurer of the bottomry interest is exonerated.  The reasons of this doctrine are not expressed. They may perhaps be derived from the English statute against reinsurance, since to make the insurer liable, while the borrower remained so, would be a guaranty of the borrower's solvency, and accordingly somewhat similar to a reinsurance.  But a mortgagee has his claim subsisting against the mortgagor, though the whole mortgaged property is lost, whereas the lender in hypothecation may, by the destruction of the property pledged, lose the sum loaned. The lender, therefore, being exposed to greater risks, has a more complete insurable interest than a mortgagee ; and yet a mortgagee, as we have seen, has an insurable interest in the property, and it does not appear by any case or *dictum,* that he may not be insured against the same risks and losses, in respect to which an absolute owner might be insured.  Insurance by a mortgagee is again much more similar to reinsurance.  It is not apparent why a lender in hypothecation has not an assurable interest to the amount of the loan, in regard to all the risks and losses against which a mortgagee may be insured."

By the law of France, a lender upon bottomry can insure the money lent, though not the expected profits of the loan. (Pothier Contrat. d'Assur. No. 44.  Alauzet traité General des Assur. No. 242, *et seq.*  Code de Commerce, art. 334, 347.  Guidon, Roccus, and Valin, as cited.)  The bor-

rower, however, cannot assure the sum borrowed, (consult the same authorities,) because as he is not compelled to repay it, if the vessel be lost, he does not run the hazard of any loss against which he can claim to be insured (See Alauzet, No. 255.) The reason why the anticipated profits of bottomry loans cannot be assured, are thus stated by Alauzet (No. 255:) Les considérations qui ont fait proscrire par beaucoup de législations l'assurance du profit maritime des prêts à la grosse sont tout à fait étrangéres aux principes du contrat d'assurance, car il est certain que c'est là un profit acquis et soumis aux risques maritimes ; mais on a permis pour ces sortes de prêt de stipuler des intérêts qui depassent le taux légal ; aucune limite n'a été mise et ne pouvait être mise, puisque les dangers de la navigation auxquels était subordonné le remboursement ne pouvaient être prévus. C'est donc à cause de cette incertitude du paiement, de cette éventualité de la créance que l'on a autorisé cette exagération dans les intérêts. En permettant de faire assurer ce profit maritime, l'incertitude disparaissant, si la différence qui existerait entre la prime payée à l'assureur et le profit stipulé de l'emprunteur dépassait le taux légal, il serait impossible de ne pas reconnaître dans ce profit une usure. On peut se demander, il est vrai, en remontant aux principes que nous venons d'exposer, si l'usure n'existera pas également, même en ne permettant que l'assurance du capital prêté ? Ce n'est pas l'incertitude seule du profit qui en légitime le taux, c'est aussi, et plus même peut-être l'incertitude du remboursement du capital : on change la nature du contrat aussi bien en permettant l'assurance du capital que celle de l'intérêt ; la condition nécessaire pour légitimer le contrat était le danger de perdre le capital. Si le voyage est heureux, le prêteur recevra 30 ou 40 pour cent d'intérêt ; s'il y a naufrage, il ne pardra rien ; ce n'était pas ce que le contrat à la grosse, quand il a été créé, avait voulu établir.

I am not aware of any case, either in the courts of England or America, which decides whether insurance may be made upon anticipated profits of maritime loans. Alauzet (No. 249) observes : Les usages aux Etats-Unis sont favorables à l'assurance du profit maritime des sommes prêtées à la grosse ainsi que du fret ; on peut être certain, en toute circonstance, de trouver les usages des Etats-Unis adopter, lorsqu'il y a contrariété entre les diverses législations, les règles les plus favorables à la liberté illimitée des conventions ; but I have been unable to discover the authority upon which he relies.